### IN THE UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| KELLY HESPE, | ) | |
| | ) | Case No. 13-cv-7998 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| THE CITY OF CHICAGO, a | ) | |
| Municipal Corporation, Chicago Police | ) | JURY TRIAL DEMANDED |
| Sergeant GERALD BREIMON, and Lieutenant | ) | |
| SARAH MCDERMOTT, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## COMPLAINT

Plaintiff, KELLY HESPE, through her attorney, Daniel Q. Herbert, makes the following complaint against the Defendants, CITY OF CHICAGO ("City"), and the following members of the Chicago Police Department: Sergeant GERALD BREIMON ("Breimon") and Lieutenant SARAH MCDERMOTT ("McDermott"), for violations of Plaintiff's protected rights and states as follows:

## INTRODUCTION

1. This action is brought by Plaintiff Kelly Hespe ("Plaintiff"), an employee of the City of Chicago's Police Department ("CPD"), pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.*, and pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution, and under state law for violation of the Gender Violence Act, 740 ILCS 82/1, the Illinois Civil Rights Act of 2003, 740 ILCS 23/1, *et. Seq.,* negligent retention, negligent supervision and intentional infliction of

1

emotional distress. Plaintiff, Hespe seeks declaratory and injunctive relief as well as damages for her injuries.

2.     Defendants' actions reflect an ongoing practice of discrimination and retaliation constituting a continuing violation.

**JURISDICTION AND VENUE**

3.     This court has jurisdiction of this case pursuant to 28 U.S.C. §§ 1331, 1343, and supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

4.     Venue is proper under 42 U.S.C. Sec. 2000(e)5(f)(3) and 28 U.S.C. § 1391(a). All parties reside in this judicial district and the events pertaining to the claims made in this complaint occurred in this district.

5.     All conditions precedent to filing suit have been met. Plaintiff filed a complaint with the Illinois Department of Human Rights ("IDHR") and the United States Equal Employment Opportunity Commission ("EEOC"), as required by Section 2000e-16 and the IDHR on April 2, 2013.

6.     The EEOC issued a "right to sue letter" to Plaintiff on August 27, 2013. (Exhibit A).

**PARTIES**

7.     Plaintiff is a female employee of the Defendant City, holding the position of police officer.

8.     The City is an employer as defined by Title VII of the Civil Rights Act of 1964 and the Illinois Human Rights Act, and was at all times relevant to this complaint, Plaintiff's employer.

9.     Defendant Breimon is a police sergeant and member of the CPD. At all times relevant to the complaint Breimon was serving in a supervisory capacity over Plaintiff for the City.

10.     Defendant Lieutenant Sarah McDermott is a member of the CPD.  At all times relevant to the complaint McDermott was acting as a supervisor of Plaintiff for the City.

11.     The City conducted its police functions under color of state law, through its officers and employees.

12.     The City employed and conferred authority on Defendants, Breimon and McDermott to act in a supervisory capacity to its officers, including Plaintiff and at all times relevant to the complaint the Defendants were acting under color of state law.

13.     The City is responsible for the acts of Defendants Breimon and McDermott, who acted within the scope of their employment and pursuant to a policy, custom, and/or pattern of sex discrimination, retaliation, and violation of individual rights of equal protection under the Fourteenth Amendment to the Constitution of the United States.

## FACTS

14.     Plaintiff has been a Chicago police officer with the City since March of 2001 and at all times relevant to the complaint has been assigned to the 14th District.

15.     Throughout her career, Plaintiff received favorable employment reviews including letters of recommendation to attend a Masters Program in Public Safety Administration which was scheduled to begin on March 13, 2013.

16.     While working as a Chicago Police Sergeant, Breimon was charged with aggravated criminal sexual abuse, unlawful restraint and official misconduct in connection with the fondling of a 25 year old female motorist in 2003.

17.     Defendant Breimon was subsequently stripped of his police powers and placed in CPD's Alternate Response Section or "call back" pending his criminal investigation.

18.     Upon information and belief the criminal charges against Breimon were dropped when the female victim failed to testify in criminal proceedings after the victim received a settlement from the City and Breimon in her civil lawsuit, Docket 1:05-cv-01527 filed in the Northern District of Illinois.    (Exhibit B)

19.     After having been relieved of his police powers for approximately five years, Breimon subsequently retained his position as a Sergeant of police, had his police powers restored, and was assigned as a supervising sergeant to the 14th District in 2008.

20.     As a Sergeant in the 14th District, Breimon worked in a direct supervisory capacity over Plaintiff on the first watch also called the midnight watch.

21.     Shortly after his transfer to the 14th District, Sergeant Breimon began using his authority as Plaintiff's supervisor to engage in an escalating course of sexually harassing and abusive conduct directed against Plaintiff that created an ongoing pattern of emotional, physical and sexual abuse of Plaintiff by Breimon.

22.     Breimon initially began by making sexually suggestive comments to Plaintiff, characterizing himself as Tarzan and Plaintiff as Jane.

23.     Plaintiff then complained to a fellow female officer, Gloria Gomez that Breimon's comments were unwelcome and made her uncomfortable.

24.     Upon information and belief, Officer Gomez confronted Breimon about his conduct and informed Breimon to stop harassing Plaintiff.

25.     Plaintiff subsequently learned through conversations with Breimon and through her own experience that she would have to run a gauntlet of sexual harassment in the 14th district in order to ensure male officers would "have her back" on calls and not refer to her as a "rat".

26.     Plaintiff discovered and was informed that she would be ostracized and retaliated against and that other officers would not be willing to work with her, if she complained about their offensive conduct.

27.     While on duty in his supervisory capacity, Breimon singled out Plaintiff when she was assigned to work alone in a squad car and he repeatedly demanded Plaintiff meet him in parking lots to talk.

28.     If Plaintiff was working with an assigned partner, Breimon would routinely park behind Plaintiff's squad car and demand that she leave her partner in their squad car, exit her squad car, and get into his vehicle to talk.

29.     During one of these talks Plaintiff informed Sergeant Breimon that a male officer had been engaging in sexually harassing and offensive conduct towards her, which included the officer masturbating in his squad car parked next to Plaintiff's car.

30.     Breimon told Plaintiff to "deal with it herself" and Breimon subsequently did not report the incident of sexual harassment.

31.     While on duty in his supervisory capacity, Breimon would instruct Plaintiff to "ride out" or extend the length of recently completed job assignments so Breimon could have lunch with Plaintiff.

32.     On multiple occasions when Plaintiff refused to comply with Breimon's demands to ride out jobs and meet him for lunch, Breimon would pull over Plaintiff's squad car and then accuse and verbally reprimand her for not promptly clearing from completed job assignments.

33.     Breimon then demanded that Plaintiff accept him as one of her Facebook friends. Plaintiff acceded to his demand and Breimon then used Facebook to make lewd, sexual and vulgar suggestions towards Plaintiff.

34.     Plaintiff informed Breimon that his comments and suggestions were lewd and offensive yet Breimon continued to make lewd, sexual, and vulgar suggestions to Plaintiff both while on duty in his supervisory capacity and while off duty through Facebook.

35.     Breimon then told Plaintiff it would be useless for her to complain or tell anyone in the police department about his conduct and actions because no one would believe Plaintiff over him.

36.     Breimon told Plaintiff that his mother, a former Assistant Deputy Superintendent still had extensive connections with high ranking officials in the CPD and that she would "get rid" of Plaintiff if Breimon desired her to, or if Plaintiff ever complained about Breimon's conduct.

37.     In November of 2009, Plaintiff was working alone when Breimon ordered Plaintiff to pull into a wooded area of Humboldt Park and sit in his squad car to talk.

38.     Plaintiff complied with the order and got into Breimon's car where Breimon took out his penis and compelled Plaintiff to perform oral sex on him.

39.     On succeeding multiple occasions, all while on duty in his supervisory capacity, Breimon demanded sexual activity from Plaintiff in various locations, including in the sergeant's office of the 14th district, in the storage room of the 14th district, and in Breimon's squad car parked in various secluded locations in Humboldt Park.

40.     In December of 2010, Breimon demanded that Plaintiff carpool to work with him so that he could have sex with her in the 14th district parking lot before and after work.

41.     The forced carpooling continued from 2010 through early November of 2012 during which Breimon continued to demand sexual activity of Plaintiff as her supervisor.

42.     Breimon continued to threaten Plaintiff about not reporting his conduct and informed Plaintiff that he would continue to demand sexual acts from her while at work and in public places because it "got him off".

43.     Breimon told Plaintiff to comply with his demands for sexual activity and if she did so that he would treat her "normal" at work and that her "life would be smooth."

44.     At various times from 2010 until November of 2012, Breimon approached Plaintiff while at work and demanded to know if she was wearing undergarments.  Breimon then reached into her uniform shirt or uniform pants and touched her chest and buttocks.  Breimon then told Plaintiff he was "checking."

45.     Plaintiff suffered adversely as she was singled out by Breimon for special scrutiny and monitoring.  On one occasion Breimon asked a commanding Lieutenant if he could work alongside Plaintiff but his request was denied.  On numerous occasions, Breimon would have Plaintiff assigned to a parking lot detail at the 14th district so he could more easily monitor her actions at the stationary post and because Plaintiff would not be working with a partner. Breimon routinely requested to have Plaintiff assigned to his supervisory logs even when Plaintiff should have been assigned to other Sergeant's for supervision.  On various occasions, Breimon would request over the radio that Plaintiff be assigned a seat belt mission and Breimon would then demand Plaintiff meet him at a lunch location instead of conducting a seat belt mission.

46.     On numerous occasions when Plaintiff would refuse Breimon's demands, Breimon would retaliate against Plaintiff by pulling over her squad car and berating her for not clearing from a job assignment promptly.  This occurred numerous times in front of Plaintiff's assigned work partners, including P.O. Eric Ricken, P.O. Melissa Milan, and P.O. Gloria Gomez.

47.     While on duty in his supervisory capacity, Breimon mocked Plaintiff in front of other police officers stating he "hated her guts" and on numerous occasions when Breimon observed Plaintiff in conversation with other police officers, Breimon walked past Plaintiff and said in a lowered voice "I fucking hate you."

48.     Breimon told Plaintiff that he had conducted a search and had located the woman who had accused him of fondling her and he now knew where the woman lived.

49.     Breimon then told Plaintiff that he had searched for her family members and he now knew where Plaintiff's family members lived as well.

50.     In 2012, while off-duty, Breimon began to monitor Hespe's work activity via a radio scanner.

51.     At various times, Breimon called Plaintiff to let her know that he was monitoring her activity even though he was off duty.  He would become angry and tell Plaintiff that her radio voice made her "sound happy" at work without him or it sounded like Plaintiff was "having a party" at work without him.

52.     On multiple occasions when Plaintiff refused Breimon's demands for sexual activity Breimon threatened suicide, stating that he was going to sit on the train tracks, take sleeping pills, or "eat his gun."

53.     At various times Breimon told Plaintiff he always kept a gun in his glove box in case he ever "needed it."

54.     On or about October 24, 2011, while on duty in his supervisory capacity, Breimon demanded that Plaintiff sit in his squad car.  Breimon threatened Plaintiff while pounding his fists on the steering wheel.  He then punched the vehicle's personal data terminal ("PDT") causing it to crack.

55.     Breimon subsequently reported the damage on an official police report where Breimon stated the cause of the damage to the PDT was unknown.  (See Exhibit C).

56.     On or about March 28, 2012, Plaintiff was en route to a job assignment with her assigned partner, Police Officer ("P.O.") Gloria Gomez, when Breimon began calling and texting Hespe while Breimon was driving in his department assigned vehicle.  Breimon screamed and yelled at Plaintiff on the phone and then crashed into a parked car.  On the phone, Breimon told Plaintiff that he had just crashed into a parked car and it was her fault.

57.     Breimon subsequently reported the accident on an official police report which stated the crash was caused by faulty acceleration.   (See Exhibit D).

58.     One day in the spring of 2012, while Breimon was on duty he continually texted and called Plaintiff when she was working with P.O. John Reppas.  Breimon then came to Illinois Masonic Hospital where Plaintiff was on a job assignment and demanded that Plaintiff sit in the car with him.  Breimon became enraged at Plaintiff and began to scream at Plaintiff telling her to "get the fuck out" of his car.  Plaintiff got out of the car while Breimon called her a "fucking whore" and accelerated the car with her hand still on the door handle.  Plaintiff returned to her partner at the hospital visibly shaken and distressed.

59.     On June 2, 2012, while on duty, Breimon yanked opened the door to Plaintiff's squad car and attempted to take her cell phone, demanding that Plaintiff show him the contents of her phone.

60.     On June 25, 2012, while on duty, Breimon used his work computer to track Plaintiff's location and continuously texted Plaintiff as to her location and her doings.

61.     On July 19, 2012, Breimon told Plaintiff that the other guys at work would "eye fuck" her and that he "wanted to choke the life out of all of them" if he could do it and not get in trouble.

62.     On July 21, 2012, while on duty, Breimon continually texted Plaintiff and demanded that Plaintiff meet him after work. Breimon threatened to show up at Plaintiff's home if she did not agree to meet him.

63.     After work, Plaintiff met Breimon in the parking lot of a hospital near Plaintiff's home where Breimon yelled at Plaintiff from his truck and blocked Plaintiff's car from leaving. Breimon then exited his truck, opened Plaintiff's door, grabbed her purse, and then hurled it at Plaintiff. Plaintiff suffered visible bruising as a result of being hit by the intentionally thrown purse.

64.     Plaintiff continued to tell Breimon to leave her and her children alone or she would report his behavior.

65.     In retaliation for Plaintiff telling Breimon to leave her alone, Breimon threatened to tell the 14th district officers negative things about Plaintiff and threatened to make her life miserable at work.

66.     On August 2, 2012, Breimon continued to harass Plaintiff at work with texts where he told Plaintiff how much he hated her and he intentionally parked his squad car outside of the police station where he could observe Plaintiff within.

67.     On September 17, 2012, Breimon told Plaintiff that he had informed Lt. Lameka that he was going to take Plaintiff as his date to a co-worker's wedding. Breimon told Plaintiff to request the night off because Lt. Lameka would assure that Plaintiff's request was granted.

68.      Plaintiff put in her request for time off and Lt. Lameka told Plaintiff that she "better be there" at the wedding.

69.     On September 19, 2012, Plaintiff was on duty in the 14th district taking a mandatory e-learning test.  Breimon confronted Plaintiff and demanded she kiss him in public.  Plaintiff refused and Breimon became visibly angry.

70.     On September 20, 2012, Breimon demanded that Plaintiff give him the key code entry to her home so he could come by and enter her home.  Plaintiff refused.

71.     On November 18, 2012, Plaintiff was off duty on her vacation when Breimon texted Plaintiff and told her that Lt. Lameka was trying to reach Plaintiff.  Breimon told Plaintiff that Lt. Lameka was demanding Plaintiff provide a valid telephone number as soon as possible.

72.     On November 30, 2012, while on duty, Breimon approached Plaintiff at work and told her he would be waiting for her at her home after work.  Plaintiff subsequently arrived home to find Breimon waiting in her driveway.  In the presence of Plaintiff's neighbors, Breimon screamed loudly out of his truck window "you are a fucking whore" before squealing his tires while driving out of Plaintiff's driveway.

73.     After this incident Plaintiff again told Breimon to leave her alone completely.  She told Breimon she was afraid of him and that she was ready to obtain a Complaint Register number and restraining order against him.

74.     On December 17, 2012, Breimon told Plaintiff that he was going to have a conversation with coworkers in the 14th District that would impact Plaintiff's credibility and ability to work with her fellow officers.  He stated that he would leave the midnight watch but before he did so he would conduct a formal roll call and disparage Plaintiff before all her fellow officers in an attempt to wreck her career.

75.     In January of 2013, Breimon transferred to the day shift after his return from furlough.

76.     In early 2013, Plaintiff was assigned to work with a male partner, P.O. Noel Ariezaga.
Officer Ariezaga got into the squad car and told Plaintiff that he wasn't "going to do shit" if he
was assigned to work with her.  Officer Ariezaga then took out a pillow and leaned his head back
as if to sleep.

77.     Plaintiff reported this incident first to Sgt. Vale and then to Lt. Lameka.  Lt. Lameka told
Plaintiff she spoke with Officer Ariezaga about the incident and that Officer Ariezaga told Lt.
Lameka that he was afraid he would get hurt working with Plaintiff because she was a female
and was petite.

78.     Lt. Lameka then told Plaintiff that she would have to continue to work with P.O.
Ariezaga or that Plaintiff would have to take compensatory time off.  Plaintiff told Lt. Lameka
that all she wanted was to be treated equally by her coworkers.

79.     No disciplinary action was taken against Officer Ariezaga as a result of Plaintiff's
complaint.

80.     Subsequently, other officers assigned to work with Plaintiff complained to district
personnel.  Unlike Plaintiff, the officers were not ordered to work with Plaintiff, nor were they
told to take compensatory time, but were in fact switched to work with officers other than
Plaintiff.

81.     On March 7, 2013, Plaintiff was assigned to work by herself on Beat 1432R.  Plaintiff
attended roll call and afterwards Lt. Sarah McDermott approached Plaintiff, pointed a finger in
Plaintiff's face and stated in a hostile tone "Oh, and Hespe, I'm working with you tonight!"
Plaintiff said "okay" and went to retrieve her police bag from the locker room.

82.     While in the locker room, Plaintiff heard her name being announced over the station
intercom.  The announcement requested "Officer Hespe come to the watch commander's office."

83.     Plaintiff went immediately to the watch commander's office and found Lt. Lameka and Defendant Lieutenant McDermott inside the office. Lt. Lameka asked Plaintiff where she had disappeared to and stated "this is no joke. You will be working with Lt. McDermott tonight."

84.     Lt. McDermott then ordered Plaintiff to go outside and see if Plaintiff's assigned squad car had a working camera in it. Plaintiff verified that the assigned squad car had a non-operable camera with a service ticket on it. When Plaintiff informed Lt. McDermott of this fact, she told Plaintiff that they would both ride in that car with Sergeant Margolis for the evening.

85.     Lt. McDermott informed Plaintiff that Plaintiff would be driving the car. Plaintiff sat in the driver's seat, Lt. McDermott sat in the passenger seat and Sgt. Margolis sat in the rear seat.

86.     Immediately upon leaving the station, Lt. McDermott began to interrogate Plaintiff as she drove. Lt. McDermott asked Plaintiff if she even knew where 1432's beat began and if she knew how to drive there. Lt. McDermott repeatedly asked Plaintiff if she could identify where she was at and where she was driving to.

87.     As Plaintiff drove, Lt. McDermott continued to interrogate Plaintiff about her location and the surrounding geography, ordering Plaintiff to name every numbered street from the south end of the 14th district to the north end of the district.

88.     Lt. McDermott told Plaintiff that if she answered any questions wrong then she would hit Plaintiff in the head with her baton.

89.     From that point on, if Plaintiff answered a question incorrectly, Lt. McDermott looked directly at Plaintiff and beat the baton into her hands. This caused Plaintiff to fear that she was going to be struck in the head by Lt. McDermott.

90.     Later in the evening, Plaintiff was ordered to write tickets and arrange for a tow of an abandoned van. As Plaintiff wrote the tickets and attempted to complete the tow report, Lt.

McDermott began to time Plaintiff's actions out load, counting the minutes it took Plaintiff to complete the tasks, stating for example that Plaintiff has used up 7 minutes so far, 9 minutes so far, etc.

91.     Plaintiff completed writing the tickets at which point she was asked if her previous inspection of the van was thorough enough.  Lt. McDermott informed Plaintiff there might be a dead body in the rear of the van because Sgt. Margolis had reported seeing a red blanket in the back of the van.  Plaintiff exited the squad can and re-inspected the van, at which point Lt. McDermott and Sgt. Margolis both began laughing at Plaintiff.

92.     Plaintiff was threatened with bodily harm and intimidated and harassed by Lt. McDermott for approximately four hours from 2300 hours until being ordered to return to the 14th district around 0300 hours.  During that course of time, Sgt. Margolis observed Lt. McDermott's threats and conduct but did not intervene in any manner.

93.     On the next day, March 8, 2013, Plaintiff contacted her union, the Fraternal Order of Police, and the Independent Police Review Authority ("IPRA") to file a complaint for the previous night's incidents with Lt. McDermott and Sgt. Margolis.

94.     IPRA informed Plaintiff that because her allegations of police misconduct involved a Lieutenant, a Sergeant or higher in rank would have to call in the complaint on her behalf.

95.     Plaintiff proceeded to the 16th police district and filed a complaint with Lt. Lewison, star #312.  Lt. Lewison logged Plaintiff's complaint and she was provided complaint register #1060606 at 1905 hours.

96.     To date, Plaintiff has not been advised what action was taken on this complaint.

97.    On March 9th, 2013, Plaintiff was scheduled to work with P.O. Michelle Perez. Plaintiff attended roll call but after roll call Plaintiff was notified that per the commander she would have to ride with P.O. Perez and Sgt. Santangelo for her entire tour.

98.    Plaintiff asked Sgt. Santangelo and Sgt. Fox, the acting District Supervisor/watch commander for the night, why this was being done to her and why this was never done to other officers. Sgt. Fox made a vague statement that it was an order from someone of higher rank, while Sgt. Santangelo told Plaintiff that it was an order from the commander and that Plaintiff's treatment was directly because of Lt. McDermott.

99.    Plaintiff believed that this shift would be a repeat of the previous evening's shift and she would be subjected to more physical threats and harassment. Shortly after the tour of duty began, Plaintiff began to suffer severe chest pains and was transported from the 14th district by ambulance to a local hospital where Plaintiff was subsequently admitted for observation and testing.

100.    Plaintiff has been on medical leave since March 11, 2013, and has been unable to return to work or to participate in the Master's degree program she had been recommended for.

101.    At all times relevant to this complaint, the Defendant City was fully aware of Breimon's previous criminal investigation and resulting civil lawsuit from his actions in 2003.

102.    Defendant City took no steps to warn female officers or to provide supervision over Sgt. Breimon that would prevent him from abusing his authority in relation to females he would supervise or have contact with while working for Defendant City. As a direct result of their omissions, the City allowed Breimon to abuse his authority and position over Plaintiff.

15

103.    At all times relevant to this complaint, Breimon's on duty harassment of Plaintiff was done within the 14th District boundaries where other police officers observed how he treated Plaintiff but took no action.

104.    As a direct result of Breimon abuse of supervisory authority, Plaintiff was shunned by some co-workers and subjected to differential treatment by other officers and supervisors.

105.    Plaintiff was selected and singled out for retaliatory actions because Plaintiff opposed Breimon's sexually harassing and assaultive conduct.

106.    Breimon's supervising officers, including Lieutenants Lameka and McDermott, were aware that Breimon had "staked a claim" to Plaintiff and pursued Plaintiff's attention both on and off duty.

107.    Lt. McDermott's actions towards Plaintiff were done to intimidate Plaintiff so Plaintiff would not report Breimon's actions.

108.    Defendant City failed to supervise its officers and allowed them to target Plaintiff for harassment creating a hostile working environment.

109.    Upon information and belief, Defendants' actions were conducted to make conditions so intolerable that Plaintiff would not enter the Master's Degree Program which would provide Plaintiff with career advancement opportunities.

110.    Defendants' actions have damaged Plaintiff and caused Plaintiff to incur medical expenses, legal expenses and to suffer from severe anxiety and stress.  Defendant has been diagnosed with PTSD as a direct result of Defendants' actions and course of conduct.  Plaintiff's additional symptoms include anxiety attacks, chest pains, severe stress, hospitalization, withdrawal from others, weight gain; lapses in short term memory, depression, lethargy,

nightmares, flashbacks, fear of being home alone, and fear when seeing Chicago Police squad cars.

## COUNT I
**Title VII, 42 U.S.C. § 2000(e) *et seq*. – Sexual Discrimination and Harassment Claim**

111.    Each of the foregoing Paragraphs is incorporated as if restated fully herein.

112.    At all relevant times to Defendant Breimon's conduct, Breimon was Plaintiff's supervisor.

113.    As described above, Breimon's conduct towards Plaintiff was unwelcome and occurred because of Plaintiff's gender.

114.    Breimon's conduct occurred over several years constituting a continuing course of discrimination toward Plaintiff.

115.    Breimon committed an unlawful employment practice by treating Plaintiff differently because of her sex and caused a change in the conditions of her employment subjecting her to a hostile work environment.

116.    Defendants have therefore denied Plaintiff her rights under the Civil Rights Act of 1964.

117.    Plaintiff has suffered damages as a direct result of her rights being violated, and they will be proven at trial.

## COUNT II
**Title VII, 42 U.S.C. § 2000(e) *et seq*. – Retaliation Claim**

118.    Each of the foregoing Paragraphs is incorporated as if restated fully herein.

119.    At all relevant times, Sergeant Breimon was also Plaintiff's supervisor.

120.    Sergeant Breimon committed an unlawful employment practice by retaliating against Plaintiff because she refused to be subjected to his continued physical, sexual and emotional abuse.

121.    Defendant City, through its agents, specifically Lt. Sarah McDermott violated Title VII by treating Plaintiff differently after Plaintiff complained about differential treatment because of her gender.

122.    Defendants' treatment of Plaintiff changed the terms and conditions of her employment, and created a hostile work environment.

123.    Therefore, Plaintiff was denied her rights under the Civil Rights Act of 1964.

**COUNT III**
**42 U.S.C. §1983 Equal Protection Claim**

124.    Each of the foregoing Paragraphs is incorporated as if restated fully herein.

125.    Plaintiff is a female and is a member of a protected class.

126.    Defendant Breimon has treated Plaintiff differently than other similarly situated individuals without any legitimate governmental purpose for doing so.

127.    Defendant Breimon's actions with respect to Plaintiff were motivated, at least in part by a discriminatory purpose, in violation of Plaintiff's constitutional rights to Equal Protection under the law and her right to bodily integrity.

128.    As a direct and proximate result of this equal protection violation, Plaintiff has suffered damages, including emotional damages, which will be proven at trial.

**COUNT IV**
**42 U.S.C. § 1983 -*Monell* Claim versus Defendant City**

129.    Each of the foregoing Paragraphs is incorporated as if restated fully herein.

130.    The misconduct described in the preceding paragraphs was undertaken pursuant to the policy and practice of the Chicago Police Department ("CPD") in that:

a.      As a matter of both policy and practice, the CPD directly encourages, and fails to adequately discipline, supervise and control its officers, and that its failure to do so manifests deliberate indifference;

b.      As a matter of both policy and practice, the CPD facilitates the very type of misconduct at issue here by failing to adequately punish and discipline prior instances of similar misconduct. Thereby leading Chicago police officers to believe their actions will never be scrutinized and, in that way, directly encouraging future abuses such as those affecting Plaintiff.  Specifically, Chicago police officers accused of misconduct can be confident that the Department will not investigate those accusations in earnest and will refuse to recommend discipline even where the officer has engaged in misconduct;

c.      As a matter of both policy and practice, the CPD fails to properly and fully investigate misconduct by Chicago police officers, and fails to pursue criminal charges against them in the same manner they would against a non-police officer citizen. The concealment and suppression of the existence of misconduct includes, but is not limited to: failure to sufficiently investigate allegations of misconduct; failure to promptly and accurately record witness statements or preserve evidence, failure to promptly interview the suspected officer; failure to properly and sufficiently discipline an officer, even where the complaint is sustained; and failure to initiate prompt disciplinary procedures related to the alleged incident, even when the allegation is obviously true.

d.      Municipal policy-makers are aware of, and condone and facilitate by their inaction,  a "code of silence" in the CPD, by which officers fail to report misconduct committed by other officers, such as the misconduct at issue in this case;

e.     As a matter of express policy, Defendant City does not retain any records which are more than seven years old documenting allegations against police officers, thereby preventing Defendant City from ascertaining any patterns of abuse which might develop over the course of a police officer's career; and

f.     Further, Defendant City fails to utilize even the records that are retained to identify and respond to patterns of misconduct by its officers.

131.   The above acts or omissions of Defendant City violated Plaintiff's right to free speech under the First Amendment to the United States Constitution and Plaintiff's Fourteenth Amendment to substantive Due Process liberty interests in bodily integrity.

132.   As a proximate result of the above-detailed actions or omissions of Defendants, Plaintiff suffered damages, including physical injuries and emotional distress.

## COUNT V
## Negligent Retention Claim versus Defendant City

133.   Each of the foregoing Paragraphs is incorporated as if restated fully herein.

134.   Defendant City knew or should have known that Defendant Breimon had a particular unfitness for the position so as to create a danger of harm to third persons.

135.   The unfitness of Defendant Breimon was known or should have been known at the time he was retained and placed in a position of authority over Plaintiff.

136.   Defendant Breimon's unfitness proximately caused Plaintiff's injury.

## COUNT VI
## Illinois Human Rights Act versus Defendant Breimon

137.   Each of the foregoing Paragraphs is incorporated as if restated fully herein.

138.    Defendant Breimon committed an unlawful employment practice by retaliating against Plaintiff because she complained about his behavior and because Plaintiff refused to be further subjected to his sexual advances.

139.    Defendant Breimon changed the terms and conditions of Plaintiff's employment and created a hostile work environment for Plaintiff.

140.    Plaintiff was thus denied her rights under the Illinois Human Rights Act.

141.    Plaintiff has suffered damages which will likely continue into the future as a direct result of her rights being violated.

**COUNT VII**
**Illinois Gender Violence Act Claim 740 ILCS 82/5 versus Defendant Breimon**

142.    Each of the foregoing Paragraphs is incorporated as if restated fully herein.

143.    Defendant Breimon's physical contact with Plaintiff from November of 2009 through November of 2012 was insulting and offensive, done intentionally and knowingly, and without Plaintiff's consent or acquiescence.

144.    Defendant Breimon's offensive and unwanted touching of Plaintiff was willful and wanton, and constitutes an act of physical aggression satisfying the elements of battery under Illinois law.

145.    As described more fully above, Defendant Breimon's conduct constituted an act of physical intrusion of a sexual nature under coercive conditions.

146.    Defendant Breimon's conduct was committed at least in part, on account of Plaintiff's sex.

147.    Defendants' actions have damaged Plaintiff and caused Plaintiff to incur medical expenses, legal expenses and to suffer from severe anxiety and stress.

**COUNT VIII**
**Illinois Intentional Infliction of Emotional Distress Claim**
**versus Defendant Breimon**

148.    Each of the foregoing Paragraphs is incorporated as if restated fully herein.

149.    As described more fully above, Defendant Breimon's intentional, willful and wanton misconduct towards Plaintiff was extreme and outrageous.

150.    As a proximate result of Defendant Breimon's intentional, willful and wanton conduct, Plaintiff has suffered great humiliation and severe emotional distress.

**COUNT IX**
**Assault Claim versus Defendant McDermott**

151.    Each of the foregoing Paragraphs is incorporated as if restated fully herein.

152.    Defendant McDermott's threats to strike Plaintiff in the head with a baton constituted assault as they placed Plaintiff in reasonable apprehension that she would be subjected to bodily harm.

153.    Defendant McDermott's assault upon Plaintiff was willful and wanton.  Additionally, Defendant McDermott's actions were insulting and offensive, done intentionally and knowingly, and without Plaintiff's consent or acquiescence.

154.    As a proximate result of Defendant McDermott's assault, Plaintiff has suffered humiliation, embarrassment, anxiety and other emotional damages which will be proven at trial.

**COUNT X**
**Intentional Infliction of Emotional Distress Claim**
**versus Defendant McDermott**

155.    Each of the foregoing Paragraphs is incorporated as if restated fully herein.

156.    As more fully described above, Defendant McDermott's intentional, willful and wanton misconduct towards Plaintiff was extreme and outrageous.

157.    As a proximate result of Defendant McDermott's intentional, willful and wanton conduct, Plaintiff has suffered great humiliation and severe emotional distress.

## COUNT XI -- State Law Claim
## Respondeat Superior

158.    Each of the foregoing Paragraphs is incorporated as if restated fully herein.

159.    In committing the acts alleged in the preceding paragraphs, the Defendant Officers were members of, and agents of, the Chicago Police Department acting at all relevant times within the scope of their employment.

160.    Defendant City is liable as principal for all torts committed by its agents.

## COUNT XII -- State Law Claim
## Indemnification

161.    Each of the foregoing Paragraphs is incorporated as if restated fully herein.

162.    Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

163.    The Defendant Officers were employees of the Chicago Police Department, who acted within the scope of their employment in committing the misconduct described herein.

WHEREFORE, Plaintiff, KELLY HESPE, respectfully requests that this Court enter judgment in her favor and against Defendants, CITY OF CHICAGO, CHICAGO POLICE SERGEANT GERALD BREIMON, and CHICAGO POLICE LIEUTENANT SARAH MCDERMOTT, awarding compensatory damages, courts costs, and attorneys' fees, as well as punitive damages against the Defendant Officers in their individual capacities, and any other relief this Court deems just and appropriate.

**PLAINTIFF DEMANDS TRIAL BY JURY.**

Respectfully submitted,

Dated:   November 7, 2013


   /s/Daniel Q. Herbert      
Daniel Q. Herbert
Plaintiffs' Attorney


The Law Offices of Daniel Q. Herbert & Associates
206 S. Jefferson, Suite 100
Chicago, IL 60661
(312) 655-7660
ARDC #6273940