# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **KELLY HESPE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 13 C 7998** |
| **v.** | ) | |
| | ) | **Judge Jorge L. Alonso** |
| **CITY OF CHICAGO, GERALD** | ) | |
| **BREIMON, and SARAH MCDERMOTT,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

After a years-long affair with a Sergeant went sour, plaintiff Kelly Hespe ("Hespe"), a police officer, filed a twelve-count complaint against defendants City of Chicago (the "City"), Gerald Breimon ("Sgt. Breimon") and Sarah McDermott ("Lt. McDermott"). Plaintiff seeks relief under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1983 and state law. The Court previously dismissed some of plaintiff's claims, and defendants have moved for summary judgment on plaintiff's remaining claims.[1]

For the reasons set forth below, the Court grants in part and denies in part defendants' motion for summary judgment.

## I.  BACKGROUND

The following facts are undisputed unless otherwise noted.[2]

---

[1] The Court previously dismissed Counts I and II against defendants Breimon and McDermott; Count III against McDermott; Count IV; Count V; and Count VI against Breimon.

[2] Local Rule 56.1 outlines the requirements for the introduction of facts parties would like considered in connection with a motion for summary judgment. The Court enforces Local Rule 56.1 strictly. Where one party supports a fact with admissible evidence and the other party fails to controvert the fact with citation to admissible evidence, the Court deems the fact admitted. *See Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218-19 (7th Cir. 2015); *Ammons v.*

Plaintiff Hespe was already married to a Chicago Police Officer when she joined the Police Academy in March 2001. There, plaintiff learned, among other things, how to defend herself from attackers and how to deal with and report domestic violence. She also received training on how to report sexual harassment. Since Officer Hespe finished the Police Academy (and at all times relevant to this case), she has been assigned to the 14th District.

The Chicago Police Department ("CPD") operates through twenty-five geographic districts, each of which is led by a Commander. The chain of command down from the Commander is Captain, Lieutenant, Sergeant and Officer. Lieutenants serve as Watch Commanders (a watch being a shift) and make officer assignments, which means the Lieutenant decides which officers will be partners. Some officers have regular partners, but, on any given night, the Lieutenant might split the partners and pair each with a different Officer. The Lieutenants are also responsible for assigning each Officer to the "log" of one of the Sergeants for each shift. During each shift, each Sergeant is responsible for observing each Officer assigned to his or her log at least twice and then recording the details of the observation onto his or her log. Sergeants are empowered to issue verbal counseling with respect to minor transgressions, such as uniform deficiencies. Sergeants can give orders to police officers, and, if those orders are lawful, police officers are expected to follow them. Sergeants lack the authority to make decisions with respect to termination, suspension, promotion or transfer and also lack the authority to change work schedules or assignments.

---

*Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817-18 (7th Cir. 2004). This does not, however, absolve the party putting forth the fact of the duty to support the fact with admissible evidence. *See Keeton v. Morningstar, Inc.*, 667 F.3d 877, 880 (7th Cir. 2012). The Court does not consider any facts that parties failed to include in their statements of fact, because to do so would rob the other party of the opportunity to show that the fact is disputed.

As a police officer, plaintiff's duties included protecting life and property and maintaining order. She was responsible for apprehending suspected violators of the law through the use of force, arrest and citation procedures. In addition, plaintiff was charged with enforcing state and local traffic laws via arrest and citation procedures. Plaintiff was also charged with knowing: public safety procedures and strategies; geographic locations in the City; and City and CPD policies, procedures and regulations. Among her job duties, plaintiff occasionally responded to domestic violence calls and gave advice to victims of domestic violence.

The interactions relevant to this case started in the autumn of 2008, not long after defendant Sgt. Breimon transferred to the 14th District and was assigned to First Watch, which is the overnight shift. Plaintiff also worked First Watch.

Plaintiff met Sgt. Breimon through her then-partner, Officer Gloria Gomez ("Gomez"). It was around Halloween when Sgt. Breimon told plaintiff that he should be Tarzan and she should be Jane. Plaintiff told Gomez she did not like the way Sgt. Breimon was talking, and Gomez passed that message onto Sgt. Breimon. A few months later, in the spring of 2009, Sgt. Breimon showed plaintiff pictures of a naked women, who had texted the photos to him.

About the same time, Sgt. Breimon "pressured" (in plaintiff's words) her to accept his Facebook friend request. Plaintiff accepted Sgt. Breimon's Facebook friend request, and she never blocked his access to her Facebook account. By the summer of 2009, plaintiff and Sgt. Breimon had become actual (not merely Facebook) friends. By then, they had started carpooling together, sometimes at plaintiff's request.

Plaintiff's sexual relationship with Sgt. Breimon began in November 2009 and ended in November 2012. (By August 2011, plaintiff was divorced from her husband.) It is not clear from the record how the relationship started, but it is undisputed that, during the course of the

relationship, plaintiff and Sgt. Breimon went on dates to movies, restaurants and concerts and met each other's children. It is undisputed that during the course of the relationship, plaintiff told Sgt. Breimon she loved and missed him. It is undisputed that plaintiff sometimes initiated sex with Sgt. Breimon and described to Sgt. Breimon what she wanted to do to him sexually. Sgt. Breimon and plaintiff communicated and flirted over social media. In late 2009 or early 2010, plaintiff stripped off her clothes for Sgt. Breimon over Skype.

The relationship between Sgt. Breimon and plaintiff was not limited to their off-duty hours. Sgt. Breimon and plaintiff engaged in oral sex and intercourse at the 14th District (in the parking lot, in the storage room and in the Sergeant's room) and in Humboldt Park. They texted each other during work hours to pass the time. Plaintiff would sometimes sit in Sgt. Breimon's squad car or they would park their cars next to each other so that they could talk.

Although plaintiff testified that she tried to make the relationship work because she thought she loved and cared for Sgt. Breimon, she also put forth evidence of her concern that if she were not in a relationship with him, her job would be negatively affected. Plaintiff put forth evidence that Sgt. Breimon told her his mother could "get rid of her," by which plaintiff apparently means she worried his mother would terminate her employment. (It is undisputed that Sgt. Brieman's mother had been the Assistant Deputy Superintendent for the CPD before she retired in 2001, seven years before Sgt. Breimon and plaintiff met.) In addition, plaintiff was worried that if she were not in a relationship with Sgt. Breimon he would not "stand up for her." This may have been a concern for her, because, as plaintiff testified, one officer told her he did not want to work with her due to his fear of getting hurt and another officer asked her whether she could handle the job. Plaintiff was worried that if she were not in a relationship with Sgt. Breimon, he would not "ride on jobs" with her and would not "back her up."

Evidence suggests Sgt. Breimon was protecting plaintiff. One police officer testified that Sgt. Breimon "showed up" on plaintiff's jobs and was both protective and helpful to her with her day-to-day routine. Sgt. Breimon once told another police officer that he rode on plaintiff's jobs to keep an eye on her and to make sure nobody got her into trouble.

The relationship sometimes interfered with plaintiff's ability to do her job. Sgt. Breimon sometimes logged plaintiff and her partner as being on long missions so that they could instead go on long lunches with Sgt. Breimon. Sgt. Breimon demanded (it is not clear from the record how many times) that plaintiff come to the 14th District so that he could kiss her and check whether she was wearing undergarments. Sgt. Breimon regularly contacted plaintiff by text and telephone while they were both working, which impacted plaintiff's ability to concentrate on her job. Although it is not clear from the record when this happened, Sgt. Breimon sent plaintiff messages through the personal data terminal, which plaintiff thought was harassing.

By 2012, the relationship was rocky. In early 2012, Sgt. Breimon followed plaintiff and her partner to Illinois Masonic Hospital and demanded that plaintiff sit in his car with him. Sgt. Breimon screamed and yelled at plaintiff. When she wanted to leave, he called her a "fucking whore." Later that year, Sgt. Breimon reached into the window of plaintiff's parked squad car, grabbed her arm and asked her why she did not answer her phone. In July 2012, while the two were arguing in a car, Sgt. Breimon threw a handbag. The parties dispute whether Sgt. Breimon intended for the handbag to hit plaintiff.

Sometime in 2012, Lt. Lameka, who was assigned to the 14th District First Watch from October 2010 to September 2014, learned that Sgt. Breimon and plaintiff were in a relationship. In August or September of 2012, Sgt. Breimon informed Lt. Lameka that he was taking plaintiff

as his date to the wedding of a co-worker. Plaintiff later asked Lt. Lameka for the night off. Once Lt. Lameka was aware of the relationship, she tried to assign the two to different sectors.

At some point, plaintiff does not say when, Sgt. Breimon threatened to destroy plaintiff's career and threatened to hold an outdoor roll call if plaintiff would not be in a relationship with him. Although she does not say when, plaintiff testified that Sgt. Breimon showed up at plaintiff's house uninvited and "stalked" her at her daughter's school.

The relationship was over in or about November 2012. Near the end of the relationship, plaintiff informed Sgt. Breimon by text message that she was afraid of him and wanted him to leave her alone. By December 2012 or January 2013, Sgt. Breimon transferred to the day shift.

Plaintiff remained a police officer on First Watch. By this time, a different Lieutenant, defendant Sarah McDermott ("Lt. McDermott") had joined the 14th District as First Lieutenant on the First Watch. Lt. McDermott had been with the CPD since 1986. Lt. McDermott, as Lieutenant, was responsible for assigning police officers their partners each night. When an officer was left without a partner, Lt. McDermott made a point to ride with that officer for safety reasons and because it provided an opportunity to observe and teach. For example, Lt. McDermott rode with Officer Ricken when he was assigned to work without a partner. During the ride, Lt. McDermott quizzed Officer Ricken on "general order oriented questions."

Lt. McDermott rode with plaintiff for the first time on March 7, 2013, a night when plaintiff had no partner. Although Lt. McDermott made the decision on the spot to ride with plaintiff, she was happy to have the chance to ride with plaintiff, because she had been concerned about plaintiff's abilities as a police officer. Previously, when plaintiff had been assigned to protect the scene of a police-involved shooting, it appeared to Lt. McDermott that plaintiff was

not properly performing her job.  In addition, on at least two occasions, plaintiff had been late to roll call.

For the March 7, 2013 shift, Lt. McDermott assigned plaintiff as driver so she could observe plaintiff's performance.  Lt. McDermott sat next to plaintiff, and Sgt. Tamara Margolis ("Sgt. Margolis") sat in the backseat.  The ride lasted from about 11:15 p.m. until about 3:00 a.m.  Lt. McDermott observed that plaintiff lacked the knowledge of a street police officer and had trouble performing a traffic stop.  Lt. McDermott observed that plaintiff did not seem to know where she was going, drove slowly (20 miles per hour) and did not use emergency equipment.

Lt. McDermott attempted to assess plaintiff's knowledge of the 14th District by asking her questions about the District's geography.  When plaintiff did not know the answers, Lt. McDermott drew plaintiff a map and began quizzing plaintiff (as she had done with other officers) in an attempt to teach her.  While Lt. McDermott was quizzing plaintiff about the streets in the 14th District, Lt. McDermott held her baton in her hands.  Plaintiff testified that Lt. McDermott told plaintiff that if she answered any questions incorrectly, Lt. McDermott would hit plaintiff in the head with her baton.  When plaintiff answered incorrectly, Lt. McDermott hit her own hand with the baton.  It is undisputed that Lt. McDermott never hit plaintiff with the baton.  During the game, Lt. McDermott and Sgt. Margolis laughed at plaintiff.

During the ride, plaintiff did not say that she was upset.  Instead, she laughed and thanked Lt. McDermott for helping.  In addition, plaintiff shared stories about herself, including where she was born and places she had lived.  At the end of the ride, plaintiff again thanked Lt. McDermott.

When the ride was over, Lt. McDermott wrote a memo about plaintiff's performance deficiencies. Lt. McDermott then discussed those deficiencies with District Commander Frank Valdez ("Commander Valdez"), and the two decided plaintiff should work with a Sergeant until she could receive additional training.

In the meantime, on March 8, 2013, plaintiff registered a complaint (a "complaint register") against Lt. McDermott in connection with the prior evening's ride along. Lt. McDermott did not learn of the complaint register until March 9, after she and Commander Valdez had already decided that plaintiff would ride with a Sergeant until she had more training.

By March 11, 2013, plaintiff was on paid medical leave from work.[3] Plaintiff remains a police officer to this day, though her paid medical leave expired at the end of April 2014. She is now on unpaid leave.

In early 2013, Lt. Lameka and Sgt. Shaun Fleischhacker wrote letters of recommendation on plaintiff's behalf in support of plaintiff's application for admission to the graduate program in Public Safety Administration at the Calumet College of St. Joseph.

The CPD maintains an Equal Employment Opportunity Policy ("EEO Policy"). The EEO Policy expressly prohibits sexual harassment, discrimination based on sex and retaliation. The EEO Policy also defines and describes those terms, as well as explaining how to complain, should an employee feel that he or she is a victim of discrimination, harassment or retaliation. Specifically, the EEO Policy sets out that an employee can complain to a supervisor, the Independent Police Review Board, the Office of Legal Affairs or the Bureau of Internal Affairs. The City also maintains a "Violence in the Workplace" Policy that expresses the City's desire to

---

[3] For purposes of this summary judgment motion, it is not clear why plaintiff took a medical leave of absence. Both parties included a sentence or two about the medical leave in their respective statements of fact, but those facts are ignored by the Court, because they were not properly supported.

provide a safe and healthy workplace.  The Violence in the Workplace Policy also provides guidelines on preventing and reporting incidents of violence at work.

Plaintiff has never filed a complaint register ("CR"), grievance or written complaint of any kind with CPD or her union about Sgt. Breimon's conduct toward her.  Nor did plaintiff utilize the City's Violence in the Workplace Policy.

In addition, plaintiff never gave her Lieutenants reason to think Sgt. Breimon was sexually harassing her.  Plaintiff never notified Lt. Lameka that she was being discriminated against, that Sgt. Breimon was sexually harassing her or that his conduct toward her was unwelcome.  Lt. Lameka never saw Sgt. Breimon touch or criticize plaintiff.  Nor did plaintiff tell Lt. McDermott that Sgt. Breimon was harassing her or that Sgt. Breimon's conduct toward her was unwelcome.  Lt. McDermott never saw Sgt. Breimon touch, threaten or criticize plaintiff.

Sgt. Fox was a Sergeant on First Watch from 2003 through the end of 2013.  Plaintiff was assigned to Sgt. Fox's log more than 100 times, but plaintiff never complained to him about Sgt. Breimon.

Likewise, plaintiff never complained about sexual harassment or discrimination to Captain Marc Buslik ("Capt. Buslik"), who was a Captain of the 14th District from January 2011 to April 2015.  Capt. Buslik had no reason to believe Sgt. Breimon was sexually harassing plaintiff or that Sgt. Breimon forced plaintiff into a relationship.

After plaintiff went out on medical leave, she filed, on April 2, 2013, a charge of discrimination with the Equal Employment Opportunity Commission.  When the City received the charge, it launched an internal investigation to consider plaintiff's claim.  After receiving a notice of right to sue, plaintiff filed this suit.

## II.    STANDARD ON A MOTION FOR SUMMARY JUDGMENT

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a).  When considering a motion for summary judgment, the Court must construe the evidence and make all reasonable inferences in favor of the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  Summary judgment is appropriate when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which that party will bear the burden of proof at trial."  *Celotex v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party."  *Brummett v. Sinclair Broadcast Group, Inc.*, 414 F.3d 686, 692 (7th Cir. 2005).

## III.    DISCUSSION

### A.    Plaintiff's Title VII claim

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer—(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, sex, or national origin."  42 U.S.C. § 2000e-2(a).  Title VII also prohibits the creation of a hostile work environment, such that the work environment is "so pervaded by discrimination that the terms and conditions of employment [are] altered."  *Vance v. Ball State Univ.*, 570 U.S. 421, 427 (2013) (citing *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993)).

Where, as here, plaintiff seeks to establish a claim for sexual harassment, a plaintiff must show:

> (1) she was subjected to unwelcome sexual harassment in the form of sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature; (2) the harassment was based on sex; (3) the sexual harassment had the effect of unreasonably interfering with the plaintiff's work performance in creating an intimidating, hostile, offensive working environment that affected seriously the psychological well-being of the plaintiff; and (4) there is a basis for employer liability.

*Benders v. Bellows & Bellows*, 515 F.3d 757, 768 (7th Cir. 2008); *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1032 (1998). The question of employer liability turns on whether the alleged harasser was a co-worker or a supervisor of the plaintiff. Where a co-worker harasses the plaintiff, an employer is liable only if it was negligent. *Faragher v. Boca Raton*, 524 U.S. 775, 789 (1998). Only if the alleged harasser is plaintiff's supervisor is it possible for the employer to be vicariously liable for the harassment. *Vance*, 570 U.S. at 428-30 (citing *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998); *Faragher*, 524 U.S. 775).

Defendant moves for summary judgment on plaintiff's sexual harassment claim, arguing that plaintiff cannot establish a basis for employer liability. Specifically, defendant argues that the alleged harasser was a co-worker, rather than a supervisor. Defendant further argues that plaintiff cannot show that defendant was negligent.

The Court first considers whether Sgt. Breiman was plaintiff's supervisor and agrees with defendant that he was not. The Supreme Court has held that in order for an employee to be considered a supervisor for purposes of employer liability for harassment, an employer must have:

empowered that employee to take tangible employment actions against the victim, *i.e.*, to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits.'

*Vance*, 570 U.S. at 431.

In this case, Sgt. Breimon, as a Sergeant, was responsible for observing (and logging the details of his observations of) each of his assigned officers at least twice per shift. Sometimes, his log included plaintiff. Sgt. Breimon could also provide verbal counseling and summary punishment for less serious transgressions, such as uniform deficiencies. Sgt. Breimon did not, however, have the type of authority outlined in *Vance*. It is undisputed that Sgt. Breimon, like all Chicago Police Department Sergeants, lacked the authority to hire, suspend, promote or transfer plaintiff. Sgt. Breimon lacked the authority to change plaintiff's work assignments or terminate her employment. Accordingly, Sgt. Breimon was not a supervisor for purposes of employer liability for sexual harassment. *See Sommerfield v. City of Chi.*, Case No. 06-cv-3132, 2010 WL 3786968 at *10 (N.D. Ill. Sept. 20, 2010) (concluding that a Sergeant was not a supervisor of a police officer for purposes of employer liability for harassment).[4]

Accordingly, in order to prevail on her sexual harassment claim, plaintiff must establish that defendant City of Chicago was "negligent in failing to prevent the harassment from taking place." *Vance*, 570 U.S. at 448-49. As the Seventh Circuit has explained:

[An employer's] liability turns on whether [plaintiff] adequately alerted the company to the problem. Notice that is sufficient to trigger employer liability must be given to either someone with authority to take corrective action or, at a minimum, someone who could 'reasonably be expected to refer the complaint up the ladder to the employee authorized to act on it.' If the employer has

---

[4] *Sommerfield* was decided before *Vance*, but in deciding *Vance*, the Supreme Court explicitly approved the Seventh Circuit's standard. *Vance*, 570 U.S. at 432 ("The Seventh Circuit's understanding of the concept of a 'supervisor,' with which we agree, is easily workable; it can be applied at both the summary judgment stage and at trial.")

established a set of procedures for reporting complaints about harassment, the complainant ordinarily should follow that policy in order to provide notice sufficient for the employer to be held responsible, unless the policy itself is subject to attack as inadequate.

*Lambert v. Peri Formworks Sys., Inc.*, 723 F.3d 863, 866-67 (7th Cir. 2013) (internal citations omitted).

Although plaintiff states that employers can be liable if negligent, she does not argue that defendant was negligent in this case or explain what evidence demonstrates defendant's negligence. The Court finds that no reasonable jury could conclude that the City was negligent in this case. It is undisputed that the City maintains a policy that both prohibits sexual harassment and explains the process for complaining about harassment. It is undisputed that plaintiff never filed a complaint register or other written complaint of any kind with her union or with CPD about Sgt. Breimon's conduct. It is undisputed that plaintiff never complained about Sgt. Breimon to Sgt. Fox (to whose log plaintiff was assigned more than 100 times), Lt. Lameka, Lt. McDermott or Capt. Buslik. It is undisputed that Lt. Lameka, Lt. McDermott and Capt. Buslik had no reason to suspect Sgt. Breimon was sexually harassing plaintiff. The first time the City learned that plaintiff thought she had been sexually harassed was when she filed her charge of discrimination with the EEOC on April 2, 2013. By that time, Sgt. Breimon had already transferred to the day shift, and plaintiff was out on medical leave. The City conducted an investigation. Based on this evidence, no reasonable jury could conclude that the City was negligent.

Accordingly, the Court grants defendant's motion for summary judgment as plaintiff's claim for sexual harassment in violation of Title VII of the Civil Rights Act of 1964.

The Court does not read plaintiff's Count I to be alleging a claim for disparate treatment (apart from the alleged sexual harassment). In response to defendant's argument that plaintiff

13

could not show an adverse employment action, however, plaintiff noted, in addition to the hostile environment, that she is no longer being paid and is no longer allowed to exercise the power of arrest. To the extent plaintiff means to make out a claim of disparate treatment based on those two actions, the Court notes that it is undisputed that the reason plaintiff cannot exercise her police powers is that she is on medical leave and that the reason she is no longer being paid is that she exhausted her paid leave. Plaintiff has put forth no evidence that either action was due to her sex. Thus, to the extent plaintiff was attempting to make out a claim for disparate treatment, the Court grants defendant summary judgment on that claim.

The Court grants defendant summary judgment on Count I.

**B.      Plaintiff's retaliation claim under Title VII**

In Count II, plaintiff claims that she was retaliated against in violation of Title VII. To prevail, plaintiff must show that she engaged in protected conduct, that she suffered an adverse action and a causal link between the two. *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016). A Title VII retaliation claim requires "proof that the desire to retaliate was the but-for cause of the challenged action." *University of Texas SW Med. Ctr v. Nassar*, 570 U.S. 338, 352, 133 S.Ct. 2517, 2528 (2013).

In moving for summary judgment, defendant argues that plaintiff's first complaint of any kind was on March 8, 2013, when she made a complaint register as to Lt. McDermott and the ride along. Defendant further argues that the only potentially-adverse action after that time was Lt. McDermott's decision to have a Sergeant ride with plaintiff until plaintiff could have further training. Defendant argues that plaintiff's complaint could not have been the but-for cause of Lt. McDermott's decision, because, at the time she made the decision, Lt. McDermott did not know about plaintiff's complaint.

The Court agrees. It is undisputed that, at the time Lt. McDermott decided to have a Sergeant ride with plaintiff, Lt. McDermott did not know plaintiff had filed a complaint register. Accordingly, the decision does not constitute retaliation, as a matter of law. *Maarouf v. Walker Mfg. Co.*, 210 F.3d 750, 755 (7th Cir. 2000) ("The critical issue here, however, is whether the person who made the decision to terminate his employment was aware of the discrimination allegations at the time, because, absent such knowledge [plaintiff] lacks a causal link between the termination and the complaint.").

In response, plaintiff argues that she also engaged in protected conduct when she complained to the EEOC. The Court agrees that filing a charge of discrimination with the EEOC constitutes protected conduct, but plaintiff does not point to any adverse action that occurred after she filed the charge (which she filed on April 2, 2013, while she was on medical leave) or make any argument as to a causal connection between an adverse action and the charge of discrimination. Next, plaintiff argues that she engaged in protected conduct when she told Sgt. Breimon to stop harassing her. She does not, however, argue that she was subjected to an adverse action after that or argue that any adverse action was causally related to such protected conduct.[5] It is plaintiff's responsibility to inform the Court of her reasons why summary judgment should not be granted. *Burton v. Board of Regents of Univ. of Wisc.*, 851 F.3d 690, 695 (7th Cir. 2017) (It "is a well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be

---

[5] Plaintiff does not make this argument, but, to the extent she is claiming Sgt. Breimon retaliated against her by threatening to hold an outdoor roll call and threatening to end her career, the Court notes that the Seventh Circuit has held that unfulfilled threats are not materially adverse actions for purposes of a Title VII retaliation claim. *Burton v. Board of Regents of Univ. of Wisc.*, 851 F.3d 690, 697 (7th Cir. 2017).

entered. If [the non-moving party] does not do so, and loses the motion, it cannot raise such reasons on appeal.") (internal citations omitted). She has not done so.

Defendant's motion for summary judgment is granted as to Count II.

**C.      Plaintiff's §1983 claim against Sgt. Breimon**

**1.      The merits**

In Count III, plaintiff seeks to hold Sgt. Breimon liable under §1983 for violating her constitutional right to equal protection of the law. Defendant argues that he is entitled to summary judgment on this claim, because plaintiff has not shown that he intentionally discriminated against her because of her membership in the class of women.

In 1986, the Seventh Circuit concluded that "[s]exual harassment of female employees by a state employer constitutes sex discrimination for purposes of the equal protection clause of the fourteenth amendment" and is, thus, actionable under §1983. *Bohen v. City of East Chi.*, 799 F.2d 1180, 1185 (7th Cir. 1986). When it did so, the Seventh Circuit explained that the "core of any equal protection case is, of course, a showing of intentional discrimination." *Bohen*, 799 F.2d at 1187. To make such a showing, a plaintiff "need not prove a discriminatory policy against an entire class; discrimination against the plaintiff because of her membership in the class is by itself enough." *Bohen*, 799 F.2d at 1187. The Seventh Circuit went on to say, "[i]t is a good defense, however, if the employer can show that the harassment suffered by the plaintiff was directed at the plaintiff because of factors personal to her and not because she is a woman."

The Seventh Circuit shed further light on this in *Trautvetter v. Quick*, 916 F.2d 1140 (7th Cir. 1990). There, the court reiterated that to prevail under §1983, plaintiff "must show an intent to discriminate *because of* her status as a female and not because of characteristics of her gender

which are personal to her." *Trautvetter*, 916 F.2d at 1151. The line between the two is fuzzy, as the Seventh Circuit recognized.

> [T]his line becomes indistinct when those facts which are personal to an individual include attributes of sexual attraction. In such a case, *a careful analysis of the conduct which is alleged to be harassment is necessary to determine whether it is indeed 'harassment'* as that term is understood in the Title VII context—the first prong of our analysis. If this distinction—subtle as it is—is not maintained, any consensual romance involving a state supervisor and employee which soured for one reason or another could give rise to equal protection claims if the employee simply alleges that his or her supervisor's conduct during the term of the romance constituted 'sexual harassment.' Such a scenario constitutes precisely the type of claim which the equal protection clause's 'intent to discriminate' requirement was meant to discourage.

*Trautvetter*, 916 F.2d at 1151 (emphasis added). The plaintiff in *Trautvetter*, after initially rebuffing the defendant's advances, engaged in a consensual affair. Plaintiff testified that "she felt no affection" for defendant but "felt she had to be there." 916 F.2d at 1144. The Court affirmed the grant of summary judgment to defendant "[b]ecause there is nothing in the record to indicate that [defendant's] sexual advances were anything but personal in nature." *Trautvetter*, 916 F.2d at 1152.

In *King v. Board of Regents of Univ. of Wisc.*, 989 F.2d 533, 538 (7th Cir. 1990), the result was different. There, the defendant subjected the plaintiff to unwelcome sexual conduct, including fondling and a physical attack. The conduct was clearly unwelcomed by the plaintiff, and in rejecting defendant's argument that he had been attracted to plaintiff as an individual, the Seventh Circuit explained, "[defendant] wanted to have an affair, a liaison, illicit sex, a forbidden relationship. His actions are not consistent with platonic love. His actions were based on her gender and motivated by his libido." *King*, 898 F.2d at 539. *King* was decided before *Trautvetter*, and, in *Trautvetter*, the court clarified that it was not King's sexual attraction to plaintiff alone that showed he was discriminating against her on the basis of her class as a

woman. *Trautvetter*, 916 F.2d at 1151. It seemed to be the lack of mutual attraction. The Seventh Circuit explained that "if, as a purely personal matter, a supervisor and a particular employee do find each other sexually attractive, it would not be sexually discriminatory under the equal protection clause for the two to engage in sexual activity." *Trautvetter*, 916 F.2d at 1152.

Based on that statement and the factual distinctions between *King* and *Trautvetter*, the Court concludes that when the Seventh Circuit said the distinction between discrimination due to membership in class versus discrimination based on characteristics of one's gender that are personal to oneself depended on "a careful analysis of the conduct which is alleged to be harassment . . . to determine whether it is indeed 'harassment,'" it meant the distinction turned on whether the plaintiff gave defendant reason to think the conduct was welcome or unwelcome.

Plaintiff argues that the conduct was unwelcome. The "correct inquiry is whether respondent by her conduct indicated that the alleged sexual advances were unwelcome." *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 68 (1986).

In this case, a jury could easily conclude that plaintiff was a willing participant in a sexual relationship with Sgt. Breimon such that his conduct toward her was based on characteristics specific to her and not due to her membership in the class of women. Plaintiff and defendant went on dates, met each other's children and had a sexual relationship that was sometimes initiated by plaintiff. In addition, plaintiff testified that she tried to make it work, because she thought she loved him. Eventually, the relationship turned sour, and Sgt. Breimon's conduct toward plaintiff turned abusive. He screamed, yelled and called her a "fucking whore." He threatened to destroy her career. Given the prior consensual relationship, a jury could reasonably conclude that Sgt. Breimon's abusive conduct toward her as the relationship was

crumbling was directed at her because of plaintiff's status as a former lover, rather than as a member of the class of women. That does not violate the constitution. *See Huebschen v. Department of Health & Human Serv.*, 716 F.2d 1167, 1172 (7th Cir. 1983) ("When the consensual romance between [alleged harasser] and [plaintiff] ended . . . , [defendant] did indeed react spitefully towards [plaintiff] by recommending that he be demoted at the end of the probationary period. But [alleged harasser's] motivation in doing so was not that [plaintiff] was male, but that he was a former lover who had jilted her."), *abrogated on other grounds by National RR Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).

Could a reasonable jury reach the opposite conclusion? Judging in the light most favorable to plaintiff, the evidence paints a picture of a woman who had reason to worry about keeping her job. Officers questioned plaintiff about whether she could do her job. Lt. McDermott eventually noticed that plaintiff lacked the knowledge of a street police officer and had trouble making a traffic stop. The evidence suggests Sgt. Breimon protected her. He showed up on her jobs and helped her with her day-to-day routine. Sgt. Breimon once told another officer that he rode on her jobs to keep an eye on her and make sure she did not get into trouble. Plaintiff was worried that if she were not in a relationship with Sgt. Breimon, then he would not "ride on jobs" with her and "back her up." Does that mean Sgt. Breimon's attention to her was unwelcome, or does it mean she welcomed his attention, because she thought it was in her own interest? It is not clear. What matters with respect to this §1983 claim is Sgt. Breimon's intent and whether he thought his sexual attention was welcome. At some point, Sgt. Breimon threatened to destroy plaintiff's career if she would not be in a relationship with him,

but it is not clear when that happened.  If it happened at the beginning of the relationship, that might suggest Sgt. Breimon knew his attention was unwelcome.[6]

As the Supreme Court said in *Meritor*, "the question whether particular conduct was indeed unwelcome presents difficult problems of proof and turns largely on credibility determinations committed to the trier of fact."  *Meritor*, 477 U.S. at 68.  Defendant has not shown that he is entitled to judgment as a matter of law on plaintiff's §1983 claim for sexual harassment.

### 2.  Qualified immunity

Defendant Breimon next argues that he is entitled to qualified immunity, "which protects government officials from liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Purvis v. Oest*, 614 F.3d 713, 720 (7th Cir. 2010) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  In determining whether a defendant is entitled to qualified immunity, the Court considers whether plaintiff has shown a violation of a constitutional right and whether the constitutional right "was clearly established at the time of the alleged violation."  *Purvis*, 614 F.3d at 720.

Plainly, by 1986, it was clearly established that sexual harassment by a state employer constituted sex discrimination for purposes of the equal protection clause of the fourteenth amendment.  *Bohen v. City of East Chi.*, 799 F.2d 1180, 1185 (7th Cir. 1986).  While defendant is correct that it was also established that consensual relationships do not violate the constitution

---

[6] That threat distinguishes this case from *Mosher v. Dollar Tree Stores, Inc.*, 240 F.3d 662, 668 (7th Cir. 2001) ("As long as men and women work together, the potential for sexual sparks to fly in the workplace will always exist.  But after a longtime sexual relationship like this one goes sour, it will be only the unusual case that can escape summary judgment.  And this one is not that unusual.").

(*Trautvetter*, 916 F.2d at 1152 ("if, as a purely personal matter, a supervisor and a particular employee do find each other sexually attractive, it would not be sexually discriminatory under the equal protection clause for the two to engage in sexual activity.")), he is accused of *unwelcome* sexual harassment. That has long been unconstitutional, and Sgt. Breimon is not entitled to qualified immunity.

Defendants' motion for summary judgment on Count III is denied.

### D. Plaintiff's state-law claims against Sgt. Breimon

In her complaint, plaintiff alleges that Sgt. Breimon violated the Illinois Gender Violence Act (Count VII) and that Sgt. Breimon subjected her to Intentional Infliction of Emotional Distress (Count VIII).

Defendant first argues that these claims are preempted by the Illinois Human Rights Act due to the factual overlap between plaintiff's sexual harassment claim and her state-law tort claims. The Court disagrees. "[A] common law tort claim is not inextricably linked with a civil rights violation where a plaintiff can establish the necessary elements of the tort independent of any legal duties created by the Illinois Human Rights Act." *Maksimovic v. Tsogalis*, 177 Ill. 2d 511, 519 (Ill. 1997). It does not matter that the claims have factual overlap; the issue is whether plaintiff can state a claim without reference to the Illinois Human Rights Act. *Torres v. Merck Sharp & Dohme Corp.*, 255 F.3d 826, 832 (N.D. Ill. 2017) ("*Factual* overlap is *not* the dividing line between preemption or not.")(emphasis in original).

Defendant also argues that he is entitled to summary judgment on the merits of the state claims. In Count VII, plaintiff alleges a violation of the Illinois Gender Violence Act, which provides a cause of action for "acts of violence or physical aggression satisfying the elements of battery under the laws of Illinois that are committed, at least in part, on the basis of a person's

sex." 740 ILCS 82/5. Defendant argues that the claim should be dismissed because, under

Illinois law, a claim for battery requires a showing of a lack of consent and, here, plaintiff

consented to their sexual relationship. Plaintiff points out that defendant threw an object at her.

The Court agrees that while there is evidence that the sexual relationship between Sgt.

Breimon and plaintiff was consensual, the record also contains evidence that Sgt. Breimon threw

a bag at plaintiff. The record lacks evidence suggesting plaintiff consented to having the bag

thrown at her. Accordingly, defendant's motion for summary judgment as to Count VII is

denied.

Because Count VII survives the motion for summary judgment, the Court also denies

defendant City of Chicago's motion for summary judgment as to Counts XI (respondeat

superior) and XII (indemnification). Defendant's sole argument for summary judgment on those

claims was that the state claims against its employees would not survive summary judgment.

One count has survived.

Next, in Count VIII, plaintiff claims intentional infliction of emotional distress. To

prevail, plaintiff must establish defendant subjected her to extreme and outrageous conduct, that

Sgt. Breimon intended for his conduct to cause severe emotional distress and that the conduct

actually caused plaintiff severe emotional distress. *Cairel v. Alderden*, 821 F.3d 823, 835 (7th

Cir. 2016). Here, defendant argues, among other things, that plaintiff has failed to show that

defendant's conduct caused plaintiff severe emotional distress. The Court agrees. Plaintiff has

put forth no evidence that she suffered severe emotional distress.[7]

Defendant's motion for summary judgment is granted as to Count VIII.

---

[7] Although plaintiff argues additional facts in her brief, the Court considers only those facts that
are both included in a statement of facts supported by record evidence.

**E.      Plaintiff's claims against Lt. McDermott.**

Plaintiff also included in her complaint two claims against Lt. McDermott.  In Count IX, plaintiff alleges that Lt. McDermott assaulted her, and in Count X, plaintiff alleges intentional infliction of emotional distress.  The claims arise out of Lt. McDermott's treatment of plaintiff during the ride along on March 7, 2013.  The undisputed evidence is that Lt. McDermott quizzed plaintiff about her geographic knowledge of the 14th District while holding her baton in her hand.  Lt. McDermott told plaintiff that if she answered incorrectly, Lt. McDermott would hit her in the head with a baton.  Instead, when plaintiff answered incorrectly, Lt. McDermott hit her own hand with the baton.

To prevail on a claim for intentional infliction of emotional distress, a plaintiff must establish: (1) the defendant's conduct was extreme and outrageous, (2) the defendant intended to inflict severe emotional distress, and (3) the defendant's conduct did cause emotional distress. *Cairel v. Alderden*, 821 F.3d 823, 835 (7th Cir. 2016).  Defendant is entitled to summary judgment on this claim.  Plaintiff has put forth no evidence that Lt. McDermott intended to inflict severe emotional distress or that plaintiff felt emotional distress.  The undisputed evidence is that, at the time, plaintiff was not upset.  Instead, plaintiff laughed and thanked Lt. McDermott.[8] Defendant is granted summary judgment on Count X.

In Count IX, plaintiff claims Lt. McDermott assaulted her.  The parties agree that an assault is "an intentional, unlawful offer of corporal injury by force unlawfully directed, under such circumstances as to create a well-founded fear of imminent peril, coupled with the apparent present ability to effectuate the attempt if not prevented."  *Parrish by Bowker v. Donahue*, 110

---

[8] Plaintiff argues additional facts in her brief, but those facts are ignored by the Court, because most were not in her statement of facts and the ones that were included were not properly supported.

Ill. App. 3d 1081, 1083 (3rd Dist. 1982). "It is not enough that victim feels 'petrified' that the defendant is going to harm her. Such feelings must have a measure of objective reasonableness." *People v. Floyd*, 278 Ill. App. 3d 568, 570 (1st Dist. 1996); *Kijonka v. Seitszinger*, 363 F.3d 645, 648 (7th Cir. 2004) (doubting plaintiff's fear "given the presence at the scene of a policeman" and noting that fear is not enough).

Defendant argues that plaintiff had no well-founded fear of imminent peril, and plaintiff argues she did. The Court agrees with defendant that no reasonable jury could conclude that plaintiff had a well-founded fear of imminent peril. It is undisputed that during the game, plaintiff did not say she was upset. Instead, she laughed and thanked Lt. McDermott for helping her. It was not objectively reasonable for a person sitting in plaintiff's seat to think her boss, a Lieutenant, was actually going to hit her in the head with a baton for answering questions incorrectly, given the undisputed facts that the parties were laughing and that Sgt. Margolis was watching from the back seat.

Defendant's motion for summary judgment is granted as to Count IX.

## IV.    CONCLUSION

For the reasons set forth above, the Court grants in part and denies in part defendants' motion for summary judgment [184]. Defendant City of Chicago is granted summary judgment on Counts I and II. Defendant Breimon is granted summary judgment on Count VIII. Defendant McDermott is granted summary judgment on Counts IX and X. Status hearing set for 5/10/18 at 9:30 a.m.

**SO ORDERED.**                                           **ENTERED:**  April 20, 2018

_____
**JORGE L. ALONSO**
**United States District Judge**